CHEW HING LUM, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lum v. Commissioner
Docket No. 5081-78.
United States Tax Court
T.C. Memo 1981-89; 1981 Tax Ct. Memo LEXIS 658; 41 T.C.M. (CCH) 980; T.C.M. (RIA) 81089; February 25, 1981. *658 Petitioner worked as a waiter in a dining room and in the production showroom in a Las Vegas, Nevada, casino-hotel. Held: (1) Amount of tip income is determined. (2) Respondent's determination of additions to tax under sec. 6653(a) (negligence) is sustained. Chew Hing Lum, pro se. J. L. Millward, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income tax against petitioner for 1974 and 1975 in the amounts of $ 3,359.32 and $ 4,004.76, respectively, and additions to tax under section 6653(a) [1] (negligence) for 1974 and 1975 in the amounts of $ 167.97 and $ 200.24, respectively. After concessions by the parties, the issues for decision *659 are as follows: (1) Whether petitioner understated his tip income and, if so, by how much; and (2) Whether petitioner is liable for additions to tax under section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petition in this case was filed, petitioner resided in Las Vegas, Nevada. During the first four months of 1974, petitioner worked as a full-time waiter in Barrymores at the MGM Grand Hotel (hereinafter sometimes referred to as "the MGM"), a casino-hotel in Las Vegas. During the remainder of 1974 and all of 1975 petitioner worked as a full-time waiter in the Ziegfield Room at the MGM. Petitioner was paid for numbers of hours (excluding vacation and sick leave but including overtime hours actually worked) relative to his work as a waiter as shown in table 1. Table 1 1974
1975
Barrymores
517
0
Ziegfield Room
1,395
2,127
1. The Ziegfield Room
The Ziegfield *660 Room first opened on April 23, 1974. During 1974 and 1975, it was the production showroom in the MGM, and its only entertainment feature was the stage show, "Hallelujah Hollywood". There were two shows nightly, except that starting in March 1975 there were three shows nightly on Saturdays. Only drinks were served in the Ziegfield Room (i.e., there were no dinner shows). During 1974 and 1975 there was a four-drink minimum charge of $ 15 (plus 13 1/2 percent taxes) per person. In the Ziegfield Room, waiters and waitresses (hereinafter referred to as "servers") set up the service areas, took drink orders, served drinks, and presented checks; they were assisted by busboys whose function was to supply and help clear the service areas. The Ziegfield Room's service areas were divided into 35 stations. Each server covered a single station by himself or herself. The stations (except station 35) had a varying capacity to serve from 28 to 44 patrons. The Ziegfield Room had a stated capacity of 860 patrons; [2] however, in 1974 and 1975 the Ziegfield Room was operating in excess of stated capacity on a consistent basis. Servers rotated on assignment through the 35 stations on a daily *661 basis; at the end of each rotation a server "floated" for two weeks, during which time he or she was assigned to different stations to substitute for sick or vacationing servers. Rotation and assignments were generally made on an equitable and uniform basis. Servers received hourly wages from the MGM and tips from the Ziegfield Room's patrons. Servers did not pool their tips. Tips were received in cash, and on credit card sales, room charges, and contract (or "coupon") sales. None of these tips were included on a server's Forms W-2 unless the tips were declared to the MGM by the server. Cash tips were received directly from the patron when the patron paid the bill and left a cash tip for the server; charge patrons might also tip in cash. If a credit card patron wrote a tip on the credit slip, the server prepared a "tip payment slip", which was taken to the cashier and redeemed for cash upon receipt or at the end of the shift. If a room charge *662 patron added a tip to the bill, the server also prepared a "tip payment slip". Contract sales were sales from individual or group tour packages. Such packages generally included the cost of room, show, and four drinks for a single price, including taxes and tips. The tips included in the single price were fifteen percent of the price of the show, excluding taxes. On the show, the applicable taxes were a sales tax of 3.5 percent and an extertainment tax of ten percent of the price of the show, excluding tips. Thus, the tips on contract sales amounted to approximately 13.2 percent of the price of the show, including taxes. A customer who purchased the package was given a coupon book containing show and drink coupons; these coupons were used by the customer to pay the bill for the show. The server redeemed the coupons through the cashier and received the fixed tip. Employment in the Ziegfield Room was generally obtained on the basis of seniority, turnover rates were low, and the job offered security. Some minor problems attributable to initial operations occurred in the Ziegfield Room, but petitioner has no continuing problems, and was not below average, with respect to his *663 work as a server. Table 2 reflects information with respect to the Ziegfield Room. Table 2 1974
1975
Paid hours of work by servers
74,852
102,308
Total sales, including taxes
$ 7,946,466.71
$ 13,130,212.61
Adjusted total sales (total
sales less excess of minimum
charge over beverage sales
$ 6,106,838.00
$ 10,751,051.00
Tips paid out by the MGM on
tip payment slips from credit
card sales, room charges, and
contract sales
$ 245,552.87
$ 398,075.00
Tips declared to the MGM by
servers
$ 157,294.60
$ 261,526.29
For the notice of deficiency, respondent determined petitioner's tip income on the basis of a formula derived from the MGM books and records of the Ziegfield Room and from certain assumptions by respondent. Respondent obtained information as to sales in the Ziegfield Room during 35 days in 1974 and 12 days in 1975 that were charged on Master Charge, American Express, and room charges. Charge sales that reflected no tip charged were excluded from the sample. The days to be used in the charge sales analysis for 1974 were ascertained through the use of a statistical technique known as a stratified random sample; such a technique is *664 commonly used and its application in this case increases the likelihood that variance due to differences in data attributable to daily or seasonal variations were accounted for. The fact that in 1974 only 35 days were sampled (on account of the nonexistence of the Ziegfield Room before April 23, 1974), whereas 52 days were recommended to be sampled for a full year, does not significantly alter or adversely affect the sample. The use of 12 days in the charge sales analysis for 1975 is statistically adequate, since it was designed merely to supplement a base year analysis. Respondent determined petitioner's tip income from the Ziegfield Room as shown in table 3. [3]
Table 3 April 23, 1974
through
December 31, 1974
1975
A. Tip percentage computation
1. Charge sales analyzed
(including taxes)
$ 139,218.50
$ 64,802
2. Tips charged on these sales
$ 21,548.01
$ 8,423
3. Tip percentage (A2./. A1)
15%
13%
B. Tips per hour computation
1. Adjusted total sales
(see table 2)
$ 6,106,838
$ 10,751,051
2. Less 15% stiff and 5%
other (20%)
$ (1,221,368)
$ (2,150,210)
3. Adjusted net sales (B2 - B1)
$ 4,885,470
$ 8,600,841
4. Gross tips (B3 X A3)
$ 732,821
$ 1,118,109
5. Less: 16.67% (tips given to
busboys, bartenders, etc.)
$ (122,161)
$ (186,389)
6. Adjusted tips (B4 - B5)
$ 610,660
$ 931,720
7. Paid hours of work by
servers (see table 2)
74,852
102,308
8. Tip rate per hour (B6./. B7)
$ 8.16
$ 9.11
C. Petitioner's tip income
1. Paid hours of work (see note 3)
1,512
2,127
2. Tip income (B8 X C1)
$ 12,337.92
$ 19,376.97
*665 On his Federal income tax return for 1974, petitioner reported as compensation from the MGM the $ 8,197.20 shown on his Form W-2 for this year. Of this amount, $ 3,617.20 is tip income declared to his employer and the remaining $ 4,580 is other compensation. Of the $ 3,617.20 tip income, $ 3,437.20 is attributable to petitioner's work in the Ziegfield Room. Of the $ 4,580 other compensation, $ 3,518 is attributable to petitioner's work in the Ziegfield Room. On his Federal income tax return for 1975, petitioner reported as compensation from the MGM the $ 12,845.28 shown on his Form W-2 for this year. Of this amount $ 7,158 is tip income declared to his employer and the remaining $ 5,687.28 is other compensation. 2. Barrymores
Barrymores was a specialty dining room in the MGM. Barrymores was divided into six or seven service stations; each station generally contained seven or eight tables. Barrymores had a capacity to serve approximately 240 patrons. One serving team, consisting of one serving captain, two servers, and a busboy (who usually worked two stations), covered a single station. Teams rotated on assignment through the stations on a daily basis; serving *666 captains rotated in an opposite direction to the servers. Serving captains and servers in a team pooled their tips and paid about 15 percent of their tips to the busboy assigned to their station. The least expensive dinner in Barrymores in 1974 was priced at $ 5.50. During 1974, the MGM paid out on tip payment slips to Barrymores serving captains and servers a total of $ 106,396.23. The total tips declared by Barrymores serving captains and servers to the MGM was $ 42,366.21. In 1974, serving captains and servers in Barrymores were paid for 56,188 hours of work. In 1974, Barrymores made sales of $ 2,194,802 (including 3.5 percent in sales tax). Respondent determined petitioner's tip income on the basis of a formula derived from the MGM books and records of Barrymores and from certain assumptions by respondent. Respondent's analysis was essentially the same as that employed with respect to the Ziegfield Room, supra, except that it involved obtaining information as to sales in Barrymores during 52 days in 1974. Respondent determined petitioner's tip income from Barrymores as shown in table 4, using the number of hours respondent determined at trial petitioner worked *667 in Barrymores. Table 4 A. Tip percentage computation
1. Charge sales analyzed (including tax)
$ 68,080.66
2. Tips charged on these sales
$ 11,516.47
3. Tip percentage (A2./. A1)
17%
B. Tips per hour computation
1. Total sales, including tax
$ 2,194,802
2. Less 15% stiff and 5% other (20%)
$ (438,960)
3. Net sales (B2 - B1)
$ 1,755,842
4. Gross tips (B3 X A3)
$ 298,493
5. Less 16.67% (tips given to busboys, etc.)
$ (49,759)
6. Adjusted tips (B4 - B5)
$ 248,734
7. Paid hours of work by servers
56,188
8. Tip rate per hour (B6./. B7)
$ 4.42
C. Petitioner's tip income
1. Paid hours of work (see note 3)
400
2. Tip income (B8 X C1)
$ 1.768
Of the income from the MGM reported by petitioner on his Federal income tax return for 1974, $ 180 of the tip income and $ 1,062 of the other compensation is attributable to his work in Barrymores. 3. Other
Petitioner did not keep records of his tip income for 1974 or 1975. The average tip rate per hour for the Ziegfield Room (corresponding to line B8 in table 3) was $ 7.34 for 1974 and $ 8.51 for 1975. The average tip rate per hour for Barrymores (corresponding to line B8 in *668 table 4) was $ 3.98 for 1974. OPINION 1. Tip Income
Petitioner reported on his Federal income tax returns, and respondent determined, the amounts of tip income shown in table 5. Table 5 1974
1975
Petitioner reported
$ 3,617.20
$ 7,158.00
Respondent determined
[4] $ 14,105.92
$ 19,376.97
Petitioner maintains that he did not earn the additional tip income determined by respondent. Respondent asserts that petitioner's tip income was not less than the amounts determined by respondent. Respondent's approach appears to be reasonable; nevertheless we are persuaded, on the basis of the record herein, that some adjustment to respondent's computation of the tip income is necessary. Also, we have found that the number of hours petitioner worked in the Ziegfield Room in 1974 was less than respondent asserted at trial and the number of hours petitioner worked in Barrymores in 1974 was concomitantly *669 more than respondent asserted at trial. Tips are, of course, includible in gross income under section 61(a), [5] e.g., Olk v. United States,536 F.2d 876, 879 (CA9 (1976); Schroeder v. Commissioner,40 T.C. 30, 33 (1963). If a taxpayer fails to keep records or the records kept do not clearly reflect income, then respondent may reconstruct the taxpayer's income by use of a formula. See Mendelson v. Commissioner,305 F.2d 519 (CA7 1962), affg. a Memorandum Opinion of this Court; [6]Meneguzzo v. Commissioner,43 T.C. 824 (1965); Sutherland v. Commissioner,32 T.C. 862 (1959). It is, however, open to petitioner to point out areas or specific instances in which the method used by respondent failed to reflect his true income. Meneguzzo v. Commissioner,43 T.C. at 835. *670 Respondent, on the basis of his statistical analysis, has determined that gross tips in the Ziegfield Room averaged twelve percent of sales, including taxes, for 1974 (15 percent based on the charge slip sample, minus 20 percent of this amount for "stiffs and other adverse factors") and 10.4 percent of sales for 1975 (13 percent minus 20 percent of this amount). If the charge slip sample was adequate, the average server grossed fifteen percent and thirteen percent for 1974 and 1975, respectively, on the charge slip sales where tips were also charged. MGM's method of computing tips on contract sales (15 percent of sales before taxes), results in each server having grossed about 13.2 percent of sales price, including taxes, on these sales. Since the latter categories of sales involved higher average tips than the overall average (after "stiffs", etc.) assumed by respondent, respondent's method of estimating tip income as to the Ziegfield Room necessarily assumes a substantially lower average gross tip rate on cash sales, and on room charges and charge slip sales where no tip was recorded on the charge slip. Respondent determined that gross tips should be further reduced by *671 one-sixth in order to take into account sharing of tips with busboys and bartenders. This determination is consistent with the parties' stipulations in the instant case. We conclude that respondent's method of determining average tip income in the instant case is reasonable. However, respondent's sampling leaves some small margin for error. In addition, we are persuaded that some greater allowance must be made for "stiffs", etc., than respondent was willing to allow. Doing the best we could with the record before us, and taking into account petitioner's lack of adequate records, we have found that the average tip rate per hour for the Ziegfield Room was $ 7.34 for 1974 and $ 8.51 for 1975. Petitioner has failed to show that he received less tip income than the average server in the Ziegfield Room during 1974 and 1975. Indeed, what evidence there is in the record on this point tends to support the conclusion that petitioner received as much tip income as the average Ziegfield Room server. Respondent used the same method in making a determination as to petitioner's tip income from Barrymores for early 1974. Taking into account the same factors as apply to the Ziegfield *672 Room, we have found that the average tip rate per hour for Barrymores was $ 3.98 for 1974. Also, respondent erred in his allocation of petitioner's 1974 work between the Ziegfield Room and Barrymores. Respondent determined that petitioner worked 1,512 hours in the Ziegfield Room and 400 hours in Barrymores. On the basis of the MGM's payroll records for petitioner, we have found (table 1, supra) that petitioner worked 1,395 hours in the Ziegfield Room and 517 hours in Barrymores. Since the hourly tip rate in the Ziegfield Room was higher than that in Barrymores, this change in allocation of hours is to be reflected in the computation under Rule 155 as a reduction in the amount of petitioner's 1974 tip income. Petitioner objects to the inclusion of taxes in the formula, arguing that customers do not compute tips on taxes. Although this may be true, removal of taxes from line B1 in tables 3 and 4 would require removal of taxes from line A1 in these tables; the tip percentage (line A3) would thereby increase and the tip rate per hour (line B8) and tip income (line C2) would remain the same. Petitioner objects to respondent's assumptions as to "stiff" rate and tips paid *673 to busboys, etc. The adjustments we have made are all that are justified by the record in the instant case. Petitioner asserts on brief that the amount of tips on charge and credit sales exceeds the amount of cash tips because charge patrons tip more generously than cash patrons. Firstly, we do not give evidentiary weight to such assertions on brief. See Rule 143(b), Tax Court Rules of Practice and Procedure.[7] Secondly, our conclusions as to overall "stiff" rate, in effect, imply a cash sales tip rate substantially less than the tip rate on the sampled charge slips. In other words, our conclusions are consistent with the general phenomenon that petitioner urges upon us. However, given the gross tip rates from the sampled charge slips and from the contract sales, the six-percent overall tip rate urged upon us by petitioner would be likely only if cash patrons left almost no tips at all. Petitioner objects to the number of days sampled *674 in the charge sales analysis, but offered no evidence to rebut the testimony of respondent's statistician who explained the commonly accepted technique of stratified random sampling and testified as to the degree of reliability that may be expected from such sampling techniques. Petitioner asserts that 35 consecutive days were sampled for the 1974 Ziegfield Room analysis. Petitioner ignores the only evidence in the record on this point--that the 35 days were not consecutive but were spread throughout that part of 1974 that the Ziegfield Room was open. Petitioner asserts that respondent's formula includes vacations, leaves of absence, and sick leave. Firstly, petitioner ignores the parties' stipulation, consistent with the exhibits and testimony in the record, that the hours used in the formula exclude vacation and sick leave. Secondly, petitioner does not favor us with an explanation of his term "leave of absence", so we have no basis for judging whether such hours are included, whether they should be excluded, and whether any such adjustment in the hours (if made consistently for all the servers) should have any effect on the tip income calculated for petitioner. On this *675 issue, we hold that petitioner's tip income is to be determined on the basis of Ziegfield Room tip rates per hour of $ 7.34 for 1974 and $ 8.51 for 1975, and a Barrymores tip rate per hour of $ 3.98 for 1974. We also hold that in 1974 petitioner worked 1,395 hours in the Ziegfield Room and 517 hours in Barrymores. 2. Additions to Tax
Petitioner has the burden of proving error in respondent's determination that additions to tax should be imposed under section 6653(a). [8]Bixby v. Commissioner,58 T.C. 757, 791-792 (1972). *676 Petitioner offers two grounds to justify his failure to keep records of his income: first, that he was instructed while at Barrymores that tips need not be reported because of their being small in amount, and second, that he feared that if tip records were kept they might "fall into evil hands and result in Petitioner being vulnerable to the numerous array of felonious theft crimes." There is no evidence in the record to support the first contention, and the second is unconvincing. Petitioner has failed to prove that properly maintained records of tip income would have shown his 1974 and 1975 tip income to be only the relatively small amounts he reported. Petitioner has failed to prove that his lack of proper records was not due to negligence. We conclude that section 6653(a) applies. On this issue we hold for respondent. To reflect the conclusions reached herein, Decision will be entered under Rule 155. Footnotes
1. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the taxable years in issue.↩
2. So the parties have stipulated. However, the stipulated capacities of 34 service stations indicate a Ziegfield Room capacity of more than 952 to 1,540 patrons. The record contains no explanation of the apparent discrepancy.↩
3. Table 3 describes the method used in the notice of deficiency. As to 1974, table 3 applies this method to only the 1,512 hours respondent determined at trial that petitioner worked in the Ziegfield Room, and not to the 1,912 hours figure used in the notice of deficiency. Our findings as to the hours worked are set forth in table 1, supra↩.
4. In the notice of deficiency, respondent determined petitioner's 1974 tip income was $ 15,602. At trial, respondent conceded the reduction to $ 14,105.92, in light of the Barrymores tip rate being substantially lower than the Ziegfield Room tip rate.↩
5. SEC. 61. GROSS INCOME DEFINED. (a) General Definition.--Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: (1) Compensation for services, including fees, commissions, and similar items; ↩
6. T.C. Memo. 1961-319↩.
7. RULE 143. EVIDENCE (b) Ex Parte Statements: Ex parte affidavits, statements in briefs, and unadmitted allegations in pleadings do not constitute evidence. As to allegations in pleadings not denied, see Rules 36(c), 37(c) and (d).↩
8. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes.--If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A * * * (relating to income taxes * * *) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. [The subsequent amendment of this provision by sec. 101(f)(8) of the Crude Oil Windfall Profit Tax Act of 1980 (Pub. L. 96-223, 94 Stat. 253) does not affect the taxable year before us.]↩